J-S71031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.C.S., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., FATHER | : : : : : : : | |
| | : | No. 655 EDA 2018 |

Appeal from the Order Entered January 25, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0001528-2017

BEFORE: PANELLA, J., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                  **FILED FEBRUARY 19, 2019**

A.C. (Father) appeals from the permanency review order finding that Father committed child abuse as to his minor son, K.C.S. (Child), born in February 2004, and that aggravated circumstances existed.[1]  We are constrained to vacate the findings of abuse and aggravated circumstances.

On May 20, 2017, Mother brought Child to the emergency department at the Children's Hospital of Philadelphia (CHOP), and Child was transferred to the pediatric intensive care unit.  On May 22, 2017, the Philadelphia Department of Human Services (DHS) received a child protective services (CPS) referral.  The referral alleged that Child was diagnosed with diabetes in

---

[1] The court also found that P.S. (Mother) had committed child abuse against Child and that aggravated circumstances existed.  Mother did not file a separate appeal from this order, and is not a party to the instant appeal.

The trial court deferred ruling on whether reasonable efforts to preserve or reunify the family were necessary.

September 2015, had a history of poor management of the disease, and was suffering from diabetic ketoacidosis at the time of his admission to CHOP. The referral also indicated that Child had a history of depression and suicidal ideation.

On May 23, 2017, a DHS social worker, Donetta Thomas, visited Child, Mother, and Father at CHOP. Mother indicated that Child was old enough to administer his own medication without supervision, and was aggressive and defensive to DHS before asking social workers to leave the hospital room. Ms. Thomas spoke with CHOP staff, who expressed concern regarding Mother's ability to care for Child on discharge and her inability to recognize the extent of Child's illness.

Ms. Thomas also spoke with Father. At the time of Child's hospitalization, Mother and Father were living separately. Mother was the primary parent. Father stated that he visited Child three or four times a week and spoke with Mother on a regular basis. Father indicated that he could not care for Child in his own home because he did not have stable housing and lived with a roommate. During their conversation, Ms. Thomas and Father discovered that Child and Mother were no longer in Child's room. After approximately twenty minutes, Father stated that he was going to get Child and left Ms. Thomas. After approximately fifteen minutes, when no one returned, Ms. Thomas found that Mother had left CHOP with Child, and that their whereabouts were unknown. CHOP called the police, and an "Amber Alert" was issued.

On May 24, 2017, DHS obtained Father's address through Child's school. DHS contacted Father, who stated that he knew what Mother did was wrong and was in contact with Mother. Father, however, refused to provide Mother's phone number to DHS and stated that he would contact Mother. Mother and Father then called DHS, and Mother agreed to return Child to CHOP. That same day, Mother returned Child to CHOP, and security restrictions were implemented.

On June 7, 2017, DHS obtained an order of protective custody (OPC) for Child. He was placed with his older sister, B.E., who had completed training for Child's care and medical needs. At a shelter care hearing on June 9, 2017, the OPC was lifted and the temporary commitment to DHS was ordered to stand.

On June 12, 2017, DHS filed a dependency petition alleging that aggravated circumstances existed. Specifically, DHS asserted that Mother and Father's failures to meet Child's medical needs constituted an aggravated circumstance for abuse under 42 Pa.C.S. § 6302(2).

On July 11, 2017, the trial court adjudicated Child dependent. A permanency review hearing was held in November 2017, at which time the court found Child was safe in his kinship placement. Child's placement goal was to return to his parent or guardian.

On January 25, 2018, the trial court convened a hearing on the abuse allegations. Ms. Thomas testified for DHS regarding DHS's receipt of the CPS

report, the circumstances leading to Child's hospitalization, and her interactions with Mother and Father.[2]  *See* N.T., 1/25/18, at 5-13.

Ms. Thomas stated that Father appeared more cooperative than Mother, but indicated that Father refused to provide her with Mother's phone number after Mother left CHOP with Child.  Ms. Thomas indicated that Father took a passive approach to Mother's care of Child.  *See id.* at 28-29.  When Ms. Thomas suggested that Father make decisions regarding Child, Father responded that "he did not want to start or get in an argument with" Mother.  *Id.* at 29.

During its examination of Ms. Thomas, DHS entered three exhibits into evidence, including: (1) the CPS referral (DHS-1); (2) Child's discharge summary from CHOP (DHS-2); and (3) a Child Protective Services Law[3] (CPSL) report from a CHOP physician, which also included an attachment containing emergency department notes (DHS-3).[4]  Father's counsel objected

---

[2] DHS also called Jasmine Jackson, a case manager for Community Umbrella Agency Turning Points, who testified in support of DHS's position that no further efforts should be made toward reunification.

[3] 23 Pa.C.S. §§ 6301-6386.

[4] Specifically, DHS-3 was a form signed by Katherine Lord, M.D., of CHOP, which read:

Dear Child Fatality Program Administrator:

Consistent with the mandates of the Pennsylvania Child Protective Services Law, this letter is to certify that:

to the admission of all three exhibits based on the failure of DHS to call witnesses to testify as to the information or expert opinions contained in the documents or that the reports were "accurate." *See id.* at 7-8, 31. The trial court overruled the objections. *Id.*

Ms. Thomas, using DHS-1, testified, in part, that: (1) Child was admitted to CHOP because he was "deprived of insulin and the medications he was supposed to receive[;]" and (2) Child showed symptoms—including vomiting, unresponsiveness, and incontinence—for three or four days before Mother brought him to the hospital. *Id.* at 7-9. Additionally, Ms. Thomas stated that DHS-3 was the document that "certified this [incident] as a near fatality." *Id.* at 30.

Father testified on his own behalf. *Id.* Father acknowledged that Child was diagnosed with diabetes at age eleven and was seeing a therapist to manage his depression following the diagnosis. *Id.* at 50. According to Father, he spoke with Mother on the night before Child's admission to CHOP.

---

> I am a physician who has treated or consulted on the case of the above-named child;
>
> The above named child is or was in serious or critical condition related to an event that generated a report to the DHS Hotline or to ChildLine (requiring a CY 47);
>
> This child has suffered injuries from an act that meets the definition of a near fatality (an act that as certified by a physician, places a child in serious or critical condition) 23 Pa.C.S. § 2303.

DHS-3. Additionally, DHS-3 contained the Emergency Department's Provider Notes.

*Id.* at 47. Mother told him Child was sick. When Father asked if they should "take him," Mother suggested that they try to use "the stuff they teach us." *Id.* When Mother called him on the morning of May 20, 2017, they took Child to CHOP. *Id.*

Father denied the allegations in DHS's exhibits that Child was sick for three or four days before his admission to CHOP, Child was breathing heavily overnight, and Child was unconscious and incontinent upon being brought to CHOP. *Id.* at 53. Instead, Father asserted that Child appeared "a little sick," was conscious and able to talk, and was complaining of tiredness. *Id.* 46-47. Father stated he believed Child was taking his medication because Child and Mother told Father he was doing so. *Id.* at 50-51.

At the conclusion of the hearing, the trial court found that both Mother and Father had committed child abuse and that aggravated circumstances existed as to both parents.[5] When finding abuse, the court quoted DHS-3 and credited the statement indicating that the incident involved a near fatality. *Id.* at 61-63 (noting that the incident was deemed a near fatality, that DHS-3 was signed by a clinician, and that the report was "part of today's evidence"). The court further found that Father did not fully cooperate with DHS and "abdicated his responsibility to ensure that the medical needs of Child [were] met." *Id.* at 62-63. However, the court deferred ruling on whether

---

[5] Child's guardian *ad litem* (GAL) opposed finding child abuse and aggravated circumstances at the hearing, arguing that DHS failed to carry its burden of proof. *See* N.T. at 59-60.

further efforts to reunify the family were necessary. That same day, the court entered its permanency review order memorializing its conclusions.

Father timely filed a notice of appeal and statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) raising the following issues:

> 1. The trial court erred and/or abused its discretion when it found that [DHS] by clear and convincing evidence had met its burden to establish that aggravated circumstances and child abuse exist[ed] as to [F]ather . . . .
>
> 2. The trial court erred and/or abused its discretion when it "founded" the CPS report of May 23, 2017 as to [F]ather.

Father's Statement of Matters Complained of on Appeal, 2/23/18.

The trial court, in its Rule 1925(a) opinion, suggested that we affirm. With respect to its finding of abuse and aggravated circumstances, the court reasoned:

> The [c]ourt found the social worker's testimony credible. The [c]ourt was reflective of the social worker's testimony of an Amber Alert trigger due to Mother's removal of [Child] from the hospital and Father's reluctant and uncooperative behavior. The [c]ourt found DHS met their burden of proof through clear and convincing evidence. The [c]ourt found [DHS-3], [the] medical report of medical physician at CHOP, supported Father's obstructive behavior. The [c]ourt was reflected of the physician's entry which stated [Child] had suffered injuries from an act that met the definition of near fatality. The [c]ourt further noted the physician's report stated the act was certified by a physician pursuant to 23 Pa.C.S. § 6303. Hence the [c]ourt found Aggravated Circumstances and Child Abuse existed as to [Child] by Father.

Trial Ct. Op., 6/20/18, at 5 (record citations omitted).

On appeal, Father raises the following questions for our review:[6]

1. Did the trial court err and/or abuse its discretion when it found that [DHS] by clear and convincing evidence met its burden to establish that child abuse and aggravated circumstances [existed] as to [F]ather?

2. Did the trial court abuse its discretion when it "founded" the CPS report of May 23, 2017 as to [F]ather?

**See** Father's Brief at vi (some capitalization omitted).

Before reaching the merits of Father's appeal, we must first determine whether he has preserved his issues. **See Krebs v. United Ref. Co. of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); Pa.R.A.P. 1925(b). Father's statement of questions, as identified in his brief, is identical to his Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

As presented in his brief, Father's arguments are intertwined. Essentially, he argues that DHS did not prove by clear and convincing evidence that he committed child abuse or that aggravated circumstances existed. **Id.** at 4. With regard to Father's first issue, he contends that the trial court did not identify a specific statutory basis upon which it made its abuse finding,

---

[6] We have reordered these questions to reflect the order in which Father addresses them in his brief. **See** Father's Brief at 4-6. Additionally, we note that the GAL has filed a brief arguing that the orders should be vacated based upon the lack of clear and convincing evidence, and that DHS has not filed a brief.

and that no testimony was presented as to what caused Child's illness and whether it was related to any action or inaction of Father. *Id.* at 4-5. With regard to Father's second issue, he argues that the court erred in admitting DHS exhibits two and three into the record: as they were reports from a doctor at CHOP and admitted for the truth of the matter asserted – namely, that Father committed acts of neglect or abuse—the reports constitute hearsay. *Id.* at 6. There was no witness present to authenticate the exhibits, and, accordingly, Father contends that they were not admissible under the business records exception. *Id.*; *see also* Pa.R.E. 803(6)(d).

Here, Father objected to the admission of the exhibits in question at the hearing. However, his statement of errors complained of on appeal makes no mention of the exhibits or any issues regarding hearsay. The trial court did not address the hearsay issue or the business records exception in its Pa.R.A.P. 1925(a) opinion. Accordingly, we conclude that Father has waived any hearsay issues or challenges to the admission of the evidence – his second issue – due to the vagueness of his Pa.R.A.P. 1925(b) statement. *Krebs*, 893 A.2d at 797; *see also In re B.C.*, 36 A.3d 601, 605 (Pa. Super. 2012) (where a parent does not raise his issues in his Pa.R.A.P. 1925(b) statement, he cannot raise such claims for the first time on appeal).

We now turn to the sole issue Father has preserved, namely, that DHS did not prove by clear and convincing evidence that he committed child abuse, because there was no evidence that Father's actions or inactions led to Child's near fatality.

Initially, we note that

> [t]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). The burden of proof in a dependency case is on the petitioner to demonstrate by clear and convincing evidence that a parent has committed child abuse or that aggravated circumstances apply. *See In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004); *see also In re A.H.*, 763 A.2d 873, 876 (Pa. Super. 2000) (stating that a finding of abuse must be supported by clear and convincing evidence). The trial court's findings must be supported by competent evidence. *See In re D.A.*, 801 A.2d 614, 618 (Pa. Super. 2002).

In the instant case, the court made two determinations: first, that Father was the perpetrator of child abuse; and second, that aggravated circumstances existed as to Child. As part of "[a] dependency adjudication, a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL. *In re L.Z.*, 111 A.3d 1164, 1176 (Pa. 2015).

> In cases of child abuse, a court's finding as to the identity of the abusers need only be established by *prima facie* evidence that the abuse normally would not have occurred except by reason of acts or omissions of the caretakers.

*In re R.P.*, 957 A.2d 1205, 1217-18 (Pa. Super. 2008) (some citations omitted).

- 10 -

The CPSL defines "child abuse" as follows, in relevant part:

**(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

\*\*\*

(1) Causing bodily injury to a child through any recent act or failure to act.

\*\*\*

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

\*\*\*

(7) Causing serious physical neglect of a child.

23 Pa.C.S. § 6303(b.1).[7]

Section 6303(a) defines "intentionally," "knowingly," and "recklessly" as "hav[ing] the same meaning as provided in 18 Pa.C.S. § 302 (relating to general requirements of culpability)," which provides:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

_____

[7] Additionally, the CPSL defines a "near fatality" as "[a] child's serious or critical condition, as certified by a physician, where that child is a subject of the report of child abuse." *Id.* at § 6303.

- 11 -

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b). Section 6303(a) defines "bodily injury" and "serious physical neglect" in the following manner:

**"Bodily injury."** Impairment of physical condition or substantial pain.

\* \* \*

**"Serious physical neglect."** Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:

(1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.

(2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S. § 6303(a).

Finally, aggravated circumstances include cases where "the child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence, or aggravated physical neglect by the parent." *See* 42 Pa.C.S. § 6302. Aggravated physical neglect is defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

> Clear and convincing evidence requires that the
>
> witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010) (citations and internal brackets omitted).

Here, DHS did not establish by clear and convincing evidence that Father had committed child abuse or that aggravated circumstances existed as to Father. Father has, indeed, waived his challenge to the admission of the medical documents, including the certification of near fatality. However, neither the documents nor the testimony of the DHS social worker demonstrate a causal link between Father's actions, or inactions, and Child's illness.

The evidence established the following. Father was not living full time with Mother and Child when Child was admitted into the hospital, although he

kept in contact with Mother and visited three to four times a week. Father assumed that Child was managing his medication properly based upon Mother and Child's representations, despite some indication that the thirteen-year-old Child had been dishonest about taking his medication in the past. Child's condition had deteriorated over the course of three to four days, including vomiting, headaches, and abdominal pain, until he was found unconscious and incontinent. Father and Mother then took Child to the hospital.

DHS-1, the CPS report, indicated that hospital staff were concerned that parents did not recognize how serious Child's deterioration had become. DHS-1 at 5, 7. Additionally, there were concerns that Father expected Child to manage his own diabetes. *Id.* Ms. Thomas further testified that she was concerned about Father because he seemed to defer to Mother and took a submissive stance to avoid arguing with Mother. N.T. at 28-29.

Father's own testimony was that, in the days leading up to the hospitalization, Child had complained of tiredness, was "a little sick," and was not himself. Father testified that Child was conscious when taken to the hospital, and the trial court found his testimony not credible in this regard. Even with that credibility determination, however, nothing in the medical records established that Father's actions or inactions had led to Child's condition. *See In re J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (noting that suspicions are not a substitute for clear and convincing evidence). Nothing in the medical records offers a definitive opinion as to what "act" caused Child's

illness, only that he had suffered from a near fatality. Similarly, nothing in the records indicated that Father knew or had serious reason to believe Child's insulin levels were not correctly monitored, or that Father interfered with Child's medical treatment.

Therefore, we conclude the evidence did not establish clear and convincing proof that Father intentionally, knowingly, or recklessly caused bodily injury or physical neglect to Child through any recent act or failure to act, or that aggravated circumstances existed. Accordingly, we vacate the trial court's orders. **R.J.T.**, 9 A.3d at 1190; **Novosielski**, 992 A.2d at 107.

Orders vacated.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/19